In re David B. HOUGH and Nanci Hough, Debtors.

The PUTNAM COUNTY NATIONAL BANK OF CARMEL, Plaintiff,

v.

David B. HOUGH and Nanci Hough, Defendants.

Bankruptcy No. 89 B 20472.
No. 89 ADV. 6071.

United States Bankruptcy Court,
S.D. New York.

March 14, 1990.

Lawrence Klein, P.C., Newburgh, N.Y. (Michael M. Goldberg, Croton on Hudson, N.Y., of counsel), for plaintiff.

Ron Stokes, Rye Brook, N.Y., for defendants.

## DECISION ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT DUE THE PUTNAM COUNTY NATIONAL BANK OF CARMEL

HOWARD SCHWARTZBERG,
Bankruptcy Judge.

Plaintiff, The Putnam County National Bank of Carmel, commenced an adversary proceeding against the Chapter 7 debtors, David B. Hough and his wife, Nanci Hough, for a determination that their obligation to the plaintiff, in the principal amount of $69,500.00, is nondischargeable under 11 U.S.C. § 523(a)(2)(B). The debtors denied the essential allegations of the complaint, but admitted that the written financial statements they submitted to the plaintiff for purposes of obtaining the advances in question were materially false at the time of submission. The issue to be resolved is whether or not the plaintiff reasonably relied upon the financial statements when it made the loans to the debtors. The trial was held on March 12, 1990.

### FINDINGS OF FACT

1. The debtors filed with this court a joint petition under Chapter 7 of the Bankruptcy Code on August 2, 1989. In their petition they admit that they are indebted to the plaintiff bank in the principal sum of $69,500.00 for loans which were advanced by the plaintiff to the debtors pursuant to promissory notes executed by the debtors.

2. In February of 1987, the debtor, David B. Hough, met with Dean Ryder, a vice president of the plaintiff bank, in the office of the bank in Carmel, New York. Dean Ryder and his brother, Wayne Ryder, are the two principal officers of the bank, which is a small family-owned domestic banking corporation. The debtor said that he was interested in opening a line of credit with the bank. The debtor informed the bank's vice president that he was the principal of a construction business known as DBH, Inc. At that time David B. Hough owned about 95% of the business and his wife had a 5% interest in the corporation.

3. The debtor gave the plaintiff a written financial statement dated as of February 28, 1987, which was signed by his wife, Nanci Hough, and which listed the name of the borrower as Nanci Hough, with a residence on Avenue A, Croton Falls, New York. The statement reflected the following items under the Assets column:

| | |
|---|---|
| Cash on hand | $ 2,000.00 |
| Cash in banks | 15,000.00 |
| Loans receivable | 34,000.00 |
| Life Insurance—Cash Surrender Value | 10,000.00 |
| Securities—Readily Marketable | 48,263.00 |
| Deferred Income | 16,250.00 |
| IRA | 2,120.00 |
| Business Equity | 60,000.00 |
| Jewelry | 21,250.00 |
| Art, antiq., rare book (sic) | 9,000.00 |
| Furniture | 38,000.00 |
| Trust Funds | 100,000.00 |
| Total Assets .................... | $335,993.00 |

The following liabilities were also listed:

| | |
|---|---|
| Accounts payable | $ 9,000.00 |

4. In May of 1987, both debtors came into the plaintiff's office for a loan. They were interviewed by Dean Ryder and his brother, Wayne Ryder, the two principal officers of the plaintiff bank. The interview sheet which the plaintiff's officers used, reflected the following information they obtained from the debtors:

| | | |
|---|---|---|
| Home | | $275,000.00 |
| First Mortgage | | 70,000.00 |
| Paid | | 90,000.00 |
| Put in Material | | 108,000.00 |
| Job (Husband) | 150,000.00 — | 160,000.00 |
| (Wife) | 50,000.00 — | 60,000.00 |

5. The debtors gave the plaintiff another financial statement with the name David B. Hough at the top and which was signed by David B. Hough. The statement was dated as of May 11, 1987 and contained the following information:

### Assets

| | |
|---|---|
| Cash on hand | $ 2,000.00 |
| Cash in Banks | 13,500.00 |
| Notes Receivable | 83,500.00 |
| Loans Receivable | 31,830.00 |
| Life Insurance–Cash Surrender value | 65,000.00 |
| Securities—Readily Marketable | 19,000.00 |
| Real Estate | 275,000.00 |
| Automobile(s) | 15,000.00 |
| Furniture, fixtures, jewelry, gold, etc. | 50,000.00 |
| Total Assets | $554,830.00 |

The liabilities on the statement were:

| | |
|---|---|
| Notes Payable to Banks—Unsecured | 36,000.00 |
| Accounts Payable | 8,500.00 |
| Real Estate Mortgages Payable | 75,000.00 |
| Total Liabilities & Net Worth | $196,000.00 |

6. Dean Ryder testified that during the interview the debtors said that they had no judgments against them and had not previously been bankrupt. Ryder testified that David B. Hough said that he owned his own home and that he had significant business income. Ryder also testified that the debtor, David B. Hough, had a good account with the bank.

7. Dean Ryder visited the house which the debtors said they owned. Ryder was familiar with the house because it was near a lumber yard that his father once owned. Dean Ryder also testified that the bank checked into David B. Hough's business relationships. The bank did not perform a title search as to the debtor's home because the debtors were not seeking a secured loan. The bank was not given a mortgage on the debtors' home.

8. Both Dean Ryder and Wayne Ryder testified that the plaintiff would not have made an unsecured loan to the debtors if they knew that the debtors did not own the home they lived in. Wayne Ryder said that the plaintiff is a small family-owned bank and that in their business operations real estate is one of the major assets which the bank relies upon to support an unsecured loan. Additionally, Wayne Ryder testified that it is their standard procedure to obtain a credit check on a prospective borrower by ordering a TRW report concerning the debtors' credit standing. Pursuant to this practice, they obtained a TRW credit report dated November 4, 1988, which reflected no adverse credit information. Wayne Ryder said that there may have been an earlier TRW report in the bank's file as a result of his standard procedure to order such a report before making a loan. However, no earlier TRW report was submitted in evidence.

9. Although the written financial statement regarding David B. Hough, dated as of May 11, 1987, showed substantially more assets than the financial statement regarding Nanci Hough dated as of February 28, 1987, both Dean and Wayne Ryder testified that this was not unusual since each statement related to a separate borrower and that nonetheless it was not unusual even for financial statements concerning the same borrower to show an increase in assets over an earlier statement because some assets could have been omitted in the earlier statement.

10. In any event, the written financial statement signed by Nanci Hough as of February 28, 1987 did not list any real estate, whereas the financial statement signed by David B. Hough, as of May 11, 1987, did list a house worth $275,000.00, subject to a first mortgage of $75,000.00.

11. The debtor, David B. Hough, explained the discrepancy in the two statements as having occurred because Dean Ryder commented as to the first financial statement regarding Nanci Hough as being insufficient to support an unsecured loan. David Hough testified that Dean Ryder informed him that more assets were required in order to justify an unsecured loan. Accordingly, the debtors submitted another financial statement reflecting more assets attributable to David B. Hough, including a $275,000.00 home, subject to a first mortgage of $75,000.00.

12. As a result of the two financial statements submitted by the debtors, the plaintiff advanced a $25,000.00 unsecured loan to the debtors for which they executed

a promissory note, dated June 1, 1987, payable to the plaintiff bank on demand in the sum of $25,000.00.

13. On August 1, 1987, the debtors obtained additional funds from the plaintiff bank in the sum of $15,000.00, for which they executed a promissory note to the plaintiff bank, dated August 1, 1987, payable on demand.

14. By letter dated October 17, 1988, the debtor, David B. Hough, submitted additional financial information to the plaintiff concerning DBH, Inc., showing total assets of $686,676.00 and total liabilities of $335,869.00. It also contained a listing of jobs under contract, including amounts in excess of $14,000,000.00.

15. On December 11, 1988, the debtors submitted a joint financial statement to the plaintiff which listed their assets as follows:

| | |
|---|---|
| Cash on hand | $ 34,500.00 |
| Securities held by broker in margin accounts | 67,263.00 |
| Real Estate | 275,000.00 |
| Loans Receivable | 149,330.00 |
| Automobiles and other personal property | 15,000.00 |
| Cash Value—life insurance | 75,000.00 |
| Deferred income | 16,250.00 |
| IRA | 2,120.00 |
| Business Equity | 60,000.00 |
| Furniture, Jewelry, Art & Antiques & Rare books | 18,250.00 |
| Trust Funds | 100,000.00 |
| Total Assets | $ 912,713.00 |

The liabilities on the financial statement were:

| | |
|---|---|
| Notes payable | $ 36,000.00 |
| Accounts and bills due | 17,500.00 |
| Real estate mortgages payable | 75,000.00 |
| Total liabilities | 128,500.00 |
| Net Worth | 912,713.00 |
| Total liab. and Net Worth | $1,041,213.00 |

16. Additionally, the financial statement listed salary as $80,000.00. Also, on the bottom of the financial statement there is a question asking "Have you ever been declared bankrupt? If so describe." The answer listed is "No". This financial statement was signed by both debtors.

17. The evidence revealed that the house which the debtors listed as an asset was never owned by them. It was acquired from the former owner by deed to Nanci Hough's parents on September 16, 1983. It also appears that the debtors had been involved in two prior bankruptcies as debtors in the 1960's and again in the 1970's.

18. The debtors contend that the three financial statements are inconsistent in that the $100,000.00 trust fund asset as listed on Nanci Hough's statement as of February 28, 1987, is not listed on David B. Hough's statement as of May 11, 1987 and appears again on their joint statement as of December 11, 1988. The plaintiff maintains that the absence of this trust fund amount on David B. Hough's statement is of no moment because the information is consistent with Nanci Hough's proclaimed assets.

19. The debtors argue that the plaintiff should have made further investigation as to the listing of the debtors' home because it is not listed on Nanci Hough's statement as of February 28, 1987, and does appear on David B. Hough's statement as of May 11, 1987 and again on the debtors' joint statement as of December 11, 1988.

20. The fact that the financial statement reflecting Nanci Hough's assets does not list any real estate, does not detract from the false information as to this property because it is listed on David B. Hough's statement and on the debtors' joint financial statement.

21. The debtors admit that their financial statements are false. The only issue is whether the plaintiff reasonably relied upon them.

22. Both witnesses for the plaintiff testified that they analyzed the written financial statements and relied upon them in advancing funds to the debtors. They also testified that it was their practice to order TRW credit reports concerning potential borrowers and that they did not order title reports as to real estate listed as an asset if the loan was unsecured. It also appears that the plaintiff would not have made the advances to the debtors as unsecured loans if they did not own the real estate listed as their home. The plaintiff had no reason to suspect that the debtors did not own the home that was listed on the financial state-

ment of David B. Hough and subsequent joint financial statements. The plaintiff's failure to do a title investigation as to the real estate listed on two of the financial statements was in accordance with the plaintiff's standard procedure of not ordering title searches or investigating the ownership of listed real estate in support of unsecured loans, other than physically inspecting or reviewing the property and its condition.

23. Based on the foregoing, it is found that the plaintiff's reliance upon the veracity of the financial statements submitted by the debtors was reasonable in the circumstances. The plaintiff had no reason to believe that the debtors did not own their home, as listed, or that they had previously been bankrupts in two prior cases.

■ 24. There is no credible evidence to support the debtors' argument that the doubling of assets on the financial statements occurred at the suggestion of Dean Ryder when he supposedly said that more assets were required to justify an unsecured loan. Even if Dean Ryder made this observation, it does not follow that he meant that David B. Hough should simply invent fictitious assets. This statement, if made by Dean Ryder, implied that a loan would not be made by the plaintiff unless the debtors actually owned more assets. It would be absurd to conclude that Dean Ryder wanted the debtors to falsify their assets, especially when Dean Ryder and his brother, Wayne Ryder, were the only principals in the family-owned bank and did not have to convince a superior lending officer that the debtors should receive an unsecured loan. In essence, the loans from the plaintiff came out of the Ryders' own pockets.

### DISCUSSION

Having conceded that they submitted to the plaintiff materially false statements in writing with respect to their financial condition, the debtors argue that their unpaid principal obligation to the plaintiff in the sum of $69,500.00 should be dischargeable because the plaintiff did not reasonably rely on the false financial statements. This

defense is bottomed on the phrase "reasonably relied" contained in 11 U.S.C. § 523(a)(2)(B), which does not discharge an individual debtor from any debt for credit extended by—

(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services or credit *reasonably relied;* and
(iv) that the debtor cause to be made or published with intent to deceive.

(Emphasis added).

■ It is clear that the plaintiff bank relied upon the materially false financial statements in writing which the debtors submitted to the plaintiff for the purpose of obtaining the unsecured loans. The plaintiff's officers testified that they would not have extended unsecured credit to the debtors had they known that the debtors did not own their home which they listed as an asset worth $275,000.00, subject to a first mortgage of $75,000.00. As a small family-owned bank in a suburban area where real estate is usually considered a borrower's major asset, the listing of this home in the debtors' written financial statements, when coupled with substantial business income arising from construction contracts and sizeable cash on hand, was a major basis for the plaintiff's unsecured loans to the debtors. While business income and cash on hand could fluctuate greatly over short periods of time, real estate represents a substantially fixed source of capital which serves to support an unsecured loan.

It also appears that the plaintiff did not fail to investigate the debtors' credit status. Apart from obtaining a TRW credit report, which was standard procedure for the plaintiff, its officers physically viewed the home listed by the debtors in order to observe its current condition. They checked out the business activities listed by the debtors as the source for their income and analyzed the information listed in the financial statements to determine their

credit worthiness. The plaintiff had no reason to suspect that the debtors had previously filed two voluntary bankruptcy cases, especially since the debtors denied in their December .11, 1988 joint financial statement, that they had ever previously filed for bankruptcy relief.

The plaintiff's officers testified that it was standard procedure not to conduct a title search on real estate listed by a borrower in a financial statement if no mortgage was sought and where the information supported an unsecured loan.

■ There was no question that the debtors intended to deceive the plaintiff and that they accomplished their purpose. The basic defense offered by the debtors is that the plaintiff failed to make a sufficiently complete credit investigation and had the plaintiff's officers done so, they would have discovered that the debtors lied when they listed their home as an asset and when they denied that they had ever previously been bankrupt. Thus, aside from the appearance of increased assets on each of the three financial statements, which the plaintiff's officers said was not unusual, there was no information contained in the three false financial statements which would cause the plaintiff to suspect that the debtors had lied.

It is precisely because the plaintiff did not conduct further investigations after they ordered a TRW credit report, but viewed the debtors' home, checked the listed contracting jobs and analyzed the submitted information, that the plaintiff should be regarded as having reasonably relied upon the debtors' written financial statements. Had the plaintiff conducted further investigations it might be argued that the plaintiff relied on its independent investigations and not on the written financial statements. "It seems obvious that one who independently investigates the financial circumstances of another, relies less on the financial statement and more on his own investigation directly proportionate to the time and effort invested in the inquiry." *In re Richards*, 71 B.R. 1017, 1021 (Bankr.D.Minn.1987).

■ Having intentionally misled the plaintiff as to material facts, it is inappropriate for the debtors to argue that their debt to the plaintiff should be dischargeable because the plaintiff believed them and that the plaintiff's investigation was insufficient to uncover their fraud, despite the fact that the plaintiff's credit review followed its standard business practice. *La Trattoria, Inc. v. Lansford (In re Lansford)*, 822 F.2d 902 (9th Cir.1987). In that case, Judge Anthony M. Kennedy (now Mr. Justice Kennedy) said: "We cannot credit Lansford's argument that La Trattoria's reliance on the financial statement was unreasonable because of its failure to verify the information in the financial statement." *Id.* at 907. When a bank follows its customary business practice of relying on a credit report and visits the site of specified real estate, as well as relies on the information listed by a debtor in a written financial statement before approving a loan, it should not be ruled that the bank's reliance was unreasonable, especially when there were no facts to put the bank on notice that the information was false. *In re Compton*, 97 B.R. 970 (Bankr.N.D.Ind. 1989); *In re Richards*, 71 B.R. at 1022; *In re Kroh Brothers Development Co.*, 88 B.R. 987 (Bankr.W.D.Mo.1988); *In re Vairo*, 40 B.R. 776 (Bankr.S.D.N.Y.1984).

The term "reasonably relied", as it appears in 11 U.S.C. § 523(a)(2)(B)(iii), was intended to prevent unscrupulous creditors from inducing debtors to falsify financial statements for the purpose of later using them to object to a debtor's discharge. *Thul v. Ophaug (In re Ophaug)*, 827 F.2d 340, 343 (8th Cir.1987); S.Rep. No. 989, 95 Cong.2d Sess. 78 (1978); H.R.Rep. No. 595, 95th Cong. 1st Sess. 130–131 (1977), U.S. Code Cong. & Admin.News 5787, 5864. There is nothing in the legislative history which implies that an unscrupulous debtor who intentionally misleads a creditor as to a material fact may excuse the deception by imposing an affirmative duty upon the creditor to conduct a thorough investigation of the false information when the creditor does not know of the falsehood, or where the information on its face is sufficient to reveal the debtor's financial condi-

tion, or where the creditor's investigation does not discover the fraud. *La Tratoria, Inc. v. Lansford (In re Lansford )*, 822 F.2d 902 at 904 (9th Cir.1987); *In re Compton,* 97 B.R. at 979; *In re Kroh Brothers Development Co.,* 88 B.R. at 995; *In re Richards,* 71 B.R. at 1022.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 28 U.S.C. § 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(I).

2. The plaintiff has sustained its burden of proving by clear and convincing evidence that the $69,500.00 principal debt owed to it by the debtors was obtained by use of statements in writing that were materially false, respecting the debtors' financial condition, on which the plaintiff reasonably relied and that the debtors caused such financial statements to be made with intent to deceive the plaintiff, as proscribed under 11 U.S.C. § 523(a)(2)(B).

3. The debtors have conceded that their written financial statements were materially false and the plaintiff has established that it reasonably relied upon them. The plaintiff was not required to conduct any further credit investigations other than those which it followed in the instant case, which were in accordance with its customary business practice.

4. The debtors intended to deceive the plaintiff as to their financial condition in order to obtain various loans from the plaintiff. The debtors' deception of the plaintiff was successful to the extent that the plaintiff now holds a claim against the debtors in the principal amount of $69,-500.00 for loans made to the debtors, which claim is nondischargeable in accordance with 11 U.S.C. § 523(a)(2)(B).

SETTLE ORDER on notice.